UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND

CIVIL ACTION NO. 13-154-DLB

SARAH SERGENT                                                                              PLAINTIFF

vs.                          MEMORANDUM OPINION AND ORDER

ASHLAND HOSPITAL CORPORATION,                                              DEFENDANT
d/b/a KING'S DAUGHTERS MEDICAL CENTER

************************

I.  Introduction

Defendant Ashland Hospital Corporation, doing business as King's Daughters Medical Center ("KDMC"), moves for summary judgment on Plaintiff Sarah Sergent's Family and Medical Leave Act ("FMLA") claim. KDMC argues that Sergent cannot state a prima facie case of retaliation, as there is no evidence of a causal connection between Sergent's exercise of FMLA rights and KDMC's decision to terminate her employment. Alternatively, KDMC contends that Sergent's claim fails the *McDonnell Douglas* burden shifting test because she cannot demonstrate that the proffered reason for termination was pretextual. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

II. Factual and Procedural Background

In 2006, Sergent began working as a full-time nurse in KDMC's Chest Pain Unit ("CPU"). (Doc. # 27-4 at 21-22). She typically served as the charge nurse on the night shift, which runs from 7 p.m. to 7 a.m. (*Id.* at 24). All CPU nurses on duty answer to the

1

"charge nurse," who assigns patients to nurses, ensures that patients' lab work is satisfactory and calls the doctor if necessary. (Doc. # 27-11 at 2). If problems arise, the charge nurse must contact the "nurse manager," who oversees daily operations, resolves personal issues, creates the schedule, addresses patient complaints and coordinates nurse education. (Doc. # 27-4 at 26). Although the nurse manager typically works day shift, he or she is on call 24/7 to assist the night shift nurses if necessary. (*Id.*). If the charge nurse cannot reach the nurse manager, he or she may contact the "house supervisor," who oversees several different units during the night shift. (*Id.*).

In Fall 2010, Sergent was diagnosed with a serious illness. (*Id.* at 109). While she underwent emergency surgery, her mother picked up an FMLA application from KDMC's Human Resources Department ("HR"). (*Id.* at 112). Sergent thought that a completed application with physician certification had been submitted on her behalf, but HR has no record of receiving a completed application. (*Id.* at 112-13; Doc. # 27-10 at 4). Without the paperwork, it is unclear whether or not Sergent was actually eligible to take FMLA leave at that time. Nevertheless, she received several weeks off of work to recover from her surgery. (Doc. # 27-4 at 112).

Sergent eventually returned to work and continued serving as the CPU charge nurse. (Doc. # 27-7 at 4). However, by Fall 2011, several of Sergent's co-workers became concerned about her because she often could not be located when needed. (*Id.*). Her fellow nurses also noted that she was spending a lot of time in the nurses' lounge. (*Id.*). When nurse manager Radella Gibson heard about these issues, she encouraged Sergent to apply for FMLA leave. (*Id.*). Gibson also contacted the Employee Assistance Program, which provides counseling for employees struggling with personal issues, and obtained

2

referral information for Sergent.  (*Id.* at 6).  Although Gibson did not specifically mention Sergent's name, Sergent felt that her identity was obvious because she was the only CPU nurse battling a serious illness.  (*Id.*).

HR soon approved Sergent for FMLA intermittent leave, which allows employees to take up to twelve weeks of unpaid leave within a twelve month period.  (Doc. # 27-10 at 6). It is typically used by employees who need a day off "here and there" to obtain treatment or recover from medical procedures.  (*Id.* at 2).  When employees wish to take an FMLA day, they must notify their immediate supervisors so they can make alternative arrangements.  (*Id.*).  They must also contact HR so it can keep track of their remaining FMLA time.  (*Id.*).

In addition to FMLA leave, KDMC encourages nurse managers to accommodate regular scheduling requests made by FMLA-approved employees.  (*Id.* at 3).  For example, if an employee requests a day off pursuant to regular scheduling procedures, nurse managers should avoid scheduling him or her to work that day if possible.  (*Id.*).  The goal is to help FMLA approved-employees conserve their FMLA days.  (*Id.*).  If a nurse manager is unable to accommodate such scheduling requests, an employee may still exercise his or her FMLA rights and take the day off.  (*Id.*).

Despite this policy, Gibson allegedly scheduled Sergent to work on a day that she had requested off in advance for medical reasons.  (Doc. # 27-4 at 30-32).  Sergent originally made this request in an effort to avoid using an FMLA day.  (*Id.*).  When she asked Gibson about the mistake, Gibson admitted that she had forgotten about Sergent's request.  (*Id.*).  Although Gibson felt that it was too late to change the final schedule, she told Sergent that she could trade shifts with another nurse.  (*Id.*).  Instead of exercising her

3

FMLA rights, Sergent cancelled her appointment and worked the shift.[1]  (*Id.*).

In March 2012, Sergent was monitoring the nurses' station when she received a call from a difficult patient.  (Doc. # 27-4 at 50).  When the conversation ended, Sergent did not hang up the receiver correctly.  (*Id.*).  The patient and family members overheard Sergent making negative comments about them, so they requested care from a different nurse. (Doc. # 27-7 at 3).  Sergent tried to explain to them that they had heard the statements out of context, but she was unable to resolve the issue.  (Doc. # 27-4 at 50).

KDMC addresses employee misbehavior in accordance with its "Discipline Without Punishment" policy, which assigns escalating consequences for repeated episodes of misconduct.  (Doc. # 27-2).  Coaching is an informal method that supervisors use to assist employees in meeting job expectations.  (*Id.* at 1).  If problems persist, employees may be subject to formal levels of discipline.  (*Id.* at 2).  A "Reminder I," which remains active for six months, is a documented formal discussion often used to deal with minor first offenses. (*Id.*).  A "Reminder II," active for nine months, is a documented discussion about a serious or continuing concern.  (*Id.*).  A "Decision-Making Leave," active for one year, is "the third, final and most serious level of formal discipline."  (*Id.*).  Termination "occurs when one or more formal levels of discipline have failed to achieve a significant and sustained improvement in the [employee's] behavior."  (*Id.* at 5).  As a result of the March 2012 incident, Sergent received a "Reminder I" and stopped serving as charge nurse.  (Doc. # 27-7 at 7).

---

1) Sergent claims that she had several scheduling issues with Gibson, but she was unable to recall any specific details about these other incidents.  (Doc. # 27-4 at 30-32).

Sergent underwent surgery about one week later. (Doc. # 27-10 at 5). KDMC granted her request for one month of FMLA continuous leave to recover from the procedure. (*Id.*). She returned to work in late April and applied for more FMLA intermittent leave. (*Id.*). However, her request was not approved until August because she belatedly provided the physician certification. (Doc. # 27-4 at 122).

Sergent committed another behavioral infraction in August 2012. (Doc. # 27-9). She and two other nurses were handling a particularly heavy patient load when they learned that another patient was about to be sent to the CPU. (Docs. # 27-4 at 73-80; 27-11 at 6). Charge nurse Terra Adkins tried to notify nurse manager Derrick Mills that they were at capacity. (Doc. # 27-11 at 6). When he did not respond, Adkins and Sergent contacted house supervisor Cheryl Cavin about their predicament. (*Id.*). According to Cavin, Adkins expressed her concerns in a professional manner, while Sergent was rude and threatened to walk off the job. (Doc. # 27-8). Sergent denies any unprofessional behavior. (Doc. # 27-4 at 76-77).

Because Sergent's Reminder I was still active when this incident occurred, Mills and his supervisor issued her a Reminder II. (Doc. # 27-2). During their meeting, Sergent asked them if she was being punished for using her FMLA leave. (Docs. # 27-4 at 76-77; 27-9). Mills and his supervisor denied this. (*Id.*; Doc. # 27-14 at 3). Nevertheless, Sergent refused to sign the Reminder II memorandum in acknowledgment. (Doc. # 27-9).

According to Sergent, morale in the CPU suffered due to Mills' poor management skills. (Doc. # 27-4 at 60-62, 83-86). She felt that Mills was watching her in particular, as he once commented that he had been checking the board where she recorded patient information. (*Id.* at 60). On another occasion, he indicated that he had reviewed her

tracker, which records a nurse's movements throughout the Unit. (*Id.*). Sergent finally asked Mills if she could switch to day shift or flex scheduling, but she never heard back from him. (Doc. # 27-4 at 83-86).

On January 5, 2013, Sergent was working night shift alongside Billie Conley and Tresa Steele. (Doc. # 27-4 at 96). Terra Adkins served as charge nurse and "floater" Tim Lewis assisted the nurses as needed. (*Id.*). Late in the shift, Sergent allegedly went in the nurses' lounge, arranged two chairs into a makeshift cot and went to sleep. (Doc. # 27-11 at 4). Because her co-workers felt that she was being particularly difficult and obnoxious that night, they let her sleep while they caught up on paperwork and tended to her patients. (*Id.*). They woke Sergent about forty-five minutes to an hour later. (*Id.*).

Charge nurses are supposed to report such incidents immediately, but Adkins did not want to tell on Sergent. (Doc. # 27-11 at 3-4). A few days later, Conley sent Mills a text message informing him that Sergent had slept on duty. (Doc. # 27-14 at 3). Mills asked Adkins about this allegation and she confirmed that it was true. (Doc. # 27-11 at 3-4). He then asked HR Team Relations Manager Chris Mokas to determine the appropriate disciplinary measure. (Docs. # 27-3 at 3-4; 27-14 at 7). While a "Decision-Making Leave" normally follows a "Reminder II," sleeping on duty is a "two step violation." (Doc. # 27-2). Because Sergent committed a "two-step" violation while her Reminder II was still active, Mokas decided that termination was appropriate. (Doc. # 27-3 at 4).

On January 17, 2013, Mills and Fields presented Sergent with a termination letter. (Docs. # 27-4 at 87; 27-14 at 7). Sergent denied sleeping on duty and asked who had made such accusations. (*Id.*). She also insisted that her tracking report would prove she had not been sleeping that night. (Doc. # 27-4 at 102). Although Mokas thought Mills

6

should have disclosed her tracking report, he did not provide any of the requested information. (*Id.*; Doc. # 27-3 at 5).

Sergent testified at an unemployment hearing in April 2013. (Doc. # 27-16). Although she admitted to taking a nap in the nurses' lounge, she insisted that she was on a break, not on duty. (*Id.* at 5). She further testified that she had become ill at work and asked to go home, but KDMC told her that there was no one to replace her. (*Id.*). She thought that this incident occurred in December, not January, but "c[ould not] say with 100% certainty." (*Id.* at 14).

At her subsequent deposition, Sergent testified that Steele knew of her plan to nap on break and had agreed to wake her up at the appropriate time. (Doc. # 27-4 at 91-97). Steele denied having such a conversation with Sergent. (Doc. # 27-12 at 1). Sergent's co-workers could not remember whether Sergent had already taken her thirty minute lunch break that evening, but noted that she usually ate early in her shift. (Doc. # 27-11 at 5). Steele also indicated that Sergent had taken at least one of her two fifteen minute breaks to smoke with her. (Doc. # 27-12 at 2).

Sergent's tracking report reveals a fifty two minute gap in activity between 4:33 a.m. and 5:25 a.m. on January 5, 2013. (Doc. # 27-17 at 15). Such gaps occur when the nurse goes into a space on the floor that the tracker does not pick up. (Docs. # 27-4 at 104-06; 27-14 at 6). Although Sergent claims that the tracker does not record several places on the floor, the only ones specifically identified are the nurses' lounge and the medication room. (Doc. # 27-4 at 104-06).

On October 1, 2013, Sergent filed this civil action in Boyd County Circuit Court. (Doc. # 1-1). KDMC promptly responded with a Notice of Removal. (Doc. # 1). Discovery

7

has now closed, and KDMC's Motion for Summary Judgment is ripe for review. (Doc. # 27).

## III. Analysis

### A. Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

### B. The Family and Medical Leave Act

The Family and Medical Leave Act ("FMLA") "entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if the employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004) (quoting 29 U.S.C. § 2612(a)(1)(D)). Under the FMLA, employers may not "interfere

8

with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). They are similarly prohibited from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

Consistent with these proscriptions, the Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge*, 384 F.3d at 244; *see also Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). Although "a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ." *Seeger*, 681 F.3d at 283. "The interference theory has its roots in the FMLA's creation of substantive rights, and '[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,' regardless of the intent of the employer." *Id.* (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). By contrast, the retaliation theory focuses on "'whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.'" *Id.* (quoting *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)).

### 1. Sergent's Termination from Employment

The Sixth Circuit has recognized that "a plaintiff ha[s] not waived a claim based on the interference theory where the complaint alleged general violations of 29 U.S.C. § 2615 that could apply to both interference and retaliation claims." *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 335 (6th Cir. 2009) (holding that the district court should have analyzed the plaintiff's claim under both theories of recovery, even though the plaintiff

failed to distinguish between them in his complaint and response to the defendant's motion for summary judgment); *see also Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (emphasizing that ambiguity in a plaintiff's complaint "does not box plaintiffs into one theory or another").

Sergent's complaint states that "the termination of the Plaintiff was in retaliation for the Plaintiff's exercise of her statutory rights under the Family Medical Leave Act, and retaliation for her disability."[2] (Doc. # 1-1, p. 2, ¶ 5). This broad allegation is cognizable under both theories of recovery, despite the fact that the parties focused solely on the retaliation theory in briefing the Motion for Summary Judgment. Accordingly, the Court will analyze Sergent's retaliatory discharge claim under both theories of recovery.

### a. *McDonnell Douglas* Burden Shifting

When an FMLA claim is "based on circumstantial evidence alleging a single motive for discrimination, it is evaluated under the familiar *McDonnell Douglas* burden-shifting framework." *Seeger*, 681 F.3d at 283 (referring to FMLA retaliation claims); *see also Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 351 (6th Cir. 2013) (stating that interference claims are also subject to the *McDonnell Douglas* burden shifting scheme). Thus, the plaintiff must first establish a prima facie case of interference or retaliation. *Id.* If the plaintiff succeeds in doing so, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse action. *Id.* Upon such a showing, the burden

---

2) Based upon this language, Sergent seems to assert a disability discrimination claim as well. In its Motion, KDMC argued that Sergent cannot establish a prima facie case of disability discrimination because there is no evidence that her disability was the sole reason for adverse employment action. (Doc. # 27-1 at 24). Because Sergent made no attempt to defend this claim in her Response, the Court finds that she has waived her right to pursue it. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.*

### I. Prima facie case of interference[3]

To state a prima facie case of FMLA interference, a plaintiff must demonstrate the following elements: (1) she is an eligible employee; (2) the defendant is an employer as defined in the Act; (3) she was entitled to leave under the FMLA; (4) she gave the defendant notice of her intention to take leave; and (5) the defendant denied her FMLA benefits to which she was entitled. *Tillman*, 545 F. App'x at 351.

The parties do not dispute that Sergent was an eligible employee and that KDMC was an employer as defined in the FMLA. The record also reflects that Sergent was entitled to take FMLA leave. In August 2012, Sergent submitted a physician certification as proof of her serious health condition. (Doc. # 27-10 at 5). KDMC approved her last FMLA intermittent leave application shortly thereafter. (Doc. # 27-4 at 122). There is no indication that Sergent had used all twelve weeks of intermittent leave prior to her termination in January 2013. As for the last two elements, the Court will simply adopt the approach of one of its sister courts and assume, without deciding, that Sergent has stated a prima facie case of FMLA interference because she regularly used FMLA leave, had

---

3) In accordance with *Morris* and *Wysong*, the Court will analyze Sergent's retaliatory discharge claim under both the interference theory and the retaliation theory.

Although Sergent testified that "I did not get every – I did not get certain FMLA days that I asked for, or sick days." (Doc. # 27-4 at 110). She then pointed to three specific instances of alleged interference with her FMLA rights: (1) nurse manager Radella Gibson scheduled her to work on a day that she specifically requested off for a doctor's appointment; (2) nurse manager Derrick Mills ignored her request to switch to day shift or flex scheduling; and (3) KDMC refused Sergent's request to go home when she became ill on duty. Because these incidents are distinct from Sergent's termination, they would theoretically form the basis for a separate FMLA interference claim. However, Sergent has not pled such a claim or otherwise indicated her intent to pursue one. While *Morris* and *Wysong* direct the Court to analyze Sergent's retaliatory discharge claim under both theories of recovery, they do not require the Court to develop every half-baked allegation of FMLA interference that occurs separately from the employee's termination. Thus, to the extent that Sergent attempts to pursue an FMLA interference claim based on the aforementioned three incidents, the Court will treat such a claim as waived. *See McPherson*, 125 F.3d at 995-96.

additional leave remaining at the time of her termination and presumably planned to use it. *See Reichard v. Oakwood Healthcare, Inc.*, No. 13-CV-13685, 2015 WL 1808095, at *6 (E.D. Mich Apr. 21, 2015) (declining to decide the case at the prima facie stage because the plaintiff's burden is low at that point and the remaining steps in the *McDonnell Douglas* analysis clearly establish that the defendant was entitled to summary judgment). Thus, the burden shifts to KDMC to articulate a legitimate non-discriminatory reason for Sergent's termination. However, because the last two steps of the tripartite burden shifting test are the same as to both theories, the Court will first consider whether Sergent has stated a prima facie case of FMLA retaliation.

### ii.     *Prima facie case of retaliation*

To establish a prima facie case of retaliation under the FMLA, a plaintiff must demonstrate the following elements: (1) he or she engaged in a statutorily protected activity; (2) the employer knew that he or she was exercising FMLA rights; (3) he or she suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Seeger*, 681 F.3d at 283 (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)). "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

If "the adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

When some time elapses between these two events, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

KDMC argues that summary judgment is appropriate because Sergent cannot prove that there is a causal connection between her use of FMLA leave and her termination. In support of this proposition, KDMC points out that Sergent's initial use of FMLA leave preceded her termination by over a year. (Doc. # 27-1 at 17). Sergent insists that "she has established a prima faci[e] case of retaliatory discharge in this case by establishing that (a) her application for Family Medical Leave was ongoing, (b) that she was denied accommodation both as to scheduling days off for medical appointments and as to leaving early from her shift due to illness, and (c) no one on behalf of King's Daughters Medical Center testified that these events did not occur." (Doc. # 30-1 at 2).

Although KDMC is correct in stating that Sergent first received FMLA leave in Fall 2011, more than a sixteen months prior to her termination, it does not cite to any case law stating that the adverse action must be close in time to the employee's *first* use of FMLA leave. In fact, case law suggests that any exercise of protected rights known to the employer, which occurs close in time to the adverse action, may be sufficient evidence of causality to state a prima facie case of retaliation. *Mickey*, 516 F.3d at 525 (collecting cases).

Sergent alleges that she last attempted to exercise her FMLA rights when she became ill on duty and asked to leave. (Doc. # 27-4 at 91). While there is some dispute as to whether this happened in late December 2012 or early January 2013, either is sufficiently close in time to her termination to establish a causal connection. *See, e.g., Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) (finding that a

one month gap between the employee's notice to employer of intent to take leave and termination was sufficient to establish a causal connection for a prima facie case); *Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004) (stating that less than a week between protected activity and adverse action was sufficient). *But see Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (concluding that two to five months was insufficient to state a prima facie case). As with Sergent's FMLA interference claim, the burden now shifts to KDMC to articulate a legitimate nondiscriminatory reason for termination.

### iii.   *Legitimate nondiscriminatory reason*

"The Sixth Circuit, in multiple unpublished opinions, has made it clear that sleeping on the job is a legitimate, nondiscriminatory ground for terminating an employee's employment when an employer has a clearly established policy against sleeping." *James v. ABX Air, Inc.*, No. 1:03-CV-00480, 2006 WL 783465, at *5 (S.D. Ohio Mar. 23, 2006) (collecting cases).

KDMC insists that it terminated Sergent's employment because other nurses observed her sleeping on duty. Because Sergent had an active Reminder II when she committed this "two-step" infraction, HR decided that termination was warranted. Sergent "concedes [ ] for purposes of this Motion that if she were sleeping on duty, that such a transgression met the criteria for termination." (Doc. # 30-1 at 2). Because KDMC has articulated a legitimate nondiscriminatory reason for termination, the burden now shifts back to Sergent to demonstrate pretext.

### iv.   *Pretext*

A plaintiff may establish pretext by demonstrating one of the following: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate

the employer's action; or (3) they were insufficient to motivate the employer's action. *Id.* "Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that the temporal proximity cannot be the sole basis for finding pretext.'" *Id.* (quoting *Donald*, 667 F.3d at 763). However, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 F. App'x 423, 426 (6th Cir. 2009).

Sergent takes a scattershot approach to demonstrating pretext. Her thesis is that the proffered reason for termination has no basis in fact because she was sleeping on her *break*, not on duty. She then suggests that her co-workers were not reliable eyewitnesses to the sleeping incident, as evidenced by the fact that they failed to notify Mills for several days. Sergent similarly insinuates that Mills had something to hide when he refused to disclose her tracking report. She finally complains that the tracking report itself is an inaccurate reflection of her movements on the floor, as it does not track several critical areas.

Although Sergent flatly denied sleeping in the nurses' lounge at the time of her termination, she later admitted to napping on her break. She now seeks to use this belated clarification as proof that the proffered reason for her termination had no basis in fact. At the time of her termination, Fields and Mokas had eyewitness accounts from Adkins and Conley to support the sleeping on duty allegation. Both nurses seemed to be operating on the assumption that Sergent had taken her thirty minute break and both fifteen minute breaks before falling asleep. However, Sergent herself was best situated to keep track of her own breaks. If she was indeed sleeping on her break, she could certainly have set the record straight at the time of her termination. She failed to do so. Sergent cannot now

establish pretext by relying upon information that she voluntarily withheld from KDMC at the time of her termination.

Sergent then suggests that her co-workers' accounts are suspect because they waited several days before reporting her to Mills.  While it is true that Conley belatedly contacted Mills about Sergent's behavior, nothing in the record suggests that KDMC, Mills or any of Sergent's co-workers manufactured these allegations in an attempt to interfere with her FMLA rights, punish her for exercising her FMLA rights or otherwise sabotage her employment.  If anything, the record reflects that Sergent's co-workers were reluctant to tell on her.  Adkins ignored her own responsibility as charge nurse to report such incidents because she did not want to get a fellow nurse in trouble.  On this record, the Court cannot infer that the proffered reason for termination is pretextual simply because her co-workers' failed to immediately report the incident.

Sergent asks the Court to draw a similar inference based on Mills' refusal to disclose her tracking report at the time of her termination.  Although Mills should have disclosed the report, his refusal to do so does not automatically cast doubt on KDMC's proffered reason for termination.  If the report ultimately revealed that Sergent was not "idle" for an hour that night, then Mills' refusal to disclose the exonerating document might support an inference of pretext.  However, Sergent's tracking report actually supports the account provided by Adkins and Conley.  Sergent maintains that this is only the case because the tracker does not adequately account for nurses' movements throughout the floor.  Although she claims that the tracker goes "idle" in multiple key places, she could only name two–the nurses' lounge and the medication room.  Again, the Court cannot infer that the proffered reason for termination was pretextual.

In short, Sergent's only legitimate evidence of pretext is the proximity between her last attempt to exercise her FMLA rights and KDMC's decision to terminate her employment. While this was sufficient to state a prima facie case, timing alone is insufficient to prove that the employer's proffered reason for termination was pretextual. Because Sergent has failed to produce any other evidence of pretext, KDMC is entitled to summary judgment on her FMLA claim under both theories of recovery.

## IV. Conclusion

Accordingly, for reasons stated herein,

**IT IS ORDERED** that the Defendant Ashland Hospital Corporation's Motion for Summary Judgment (Doc. # 27) be, and is, hereby **granted in full**. A Judgment shall be entered contemporaneously herewith.

This 10th day of September, 2015.



Signed By:
*David L. Bunning*  DB
United States District Judge

G:\DATA\Opinions\Ashland\13-154 Sergent MSJ.wpd